ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-40008-01-JAR |
| | ) | |
| SCOTT D. BECKER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Before the Court is defendant Scott D. Becker's Motion for Rehearing and Appeal of

Detention Order (Doc. 40) entered by the Honorable K. Gary Sebelius, United States Magistrate

Judge for the District of Kansas on April 14, 2009.  The Court conducted a detention hearing on

May 14, 2009, and a supplemental hearing on June 4, 2009.  As discussed more fully below, the

Court denies defendant's motion.

*Background*

In 1999, defendant became President of Countryside Bank, a federally insured banking

institution.  The Indictment alleges thirty-three counts of theft, embezzlement and misapplication

by a bank officer and employee pursuant to 18 U.S.C. §§ 2 and 656 and one count of conspiracy

to commit theft, embezzlement and misapplication by a bank officer and employee.  The

Indictment charges conduct beginning in 1999 and continuing until 2003, when defendant was

removed from the Bank as a result of an examination by the Kansas Banking Commission.  The

Indictment alleges in part that defendant:

> used his knowledge of internal bank operations to facilitate and
> conceal evidence of his fraudulent activity, doing, among other

> things, the preparation and execution of general ledger debit tickets
> to obtain access to operating funds of the bank for his own
> personal use and benefit, circumvention of proper loan approval
> processes, and engaging in nominee loan transactions; that is
> establishing loans at the bank which appear to be to a bank
> customer, but in fact benefitted Becker personally. These
> transactions resulted in the theft, embezzlement and misapplication
> of more than $2,000,000 in money from the bank's operating funds
> to fund the operation of Becker's various related business interests
> and augment his personal lifestyle.[1]

By all accounts, a grand jury investigation into matters pertaining to the bank began in 2003. According to defendant's retained counsel during that investigation, Jeff Morris, there was little to no activity concerning the investigation after 2004. Defendant learned that the government had renewed its inquiry into defendant's conduct at the bank in May 2008. In June 2008, Mr. Morris coordinated production of documents in response to a grand jury subpoena. On November 8, 2008, Mr. Morris exchanged e-mails with Assistant United States Attorney Hathaway in which AUSA Hathaway reported that the government may present an indictment to the Grand Jury in January or February 2009. By November 17, 2008, Mr. Morris had contacted defendant and in December 2008, indicated to AUSA Hathaway that he would like to meet with AUSA Hathaway about the potential case. Mr. Morris kept defendant apprised of these events and defendant responded to his contacts. By late January 2009, Mr. Morris told AUSA Hathaway that defendant was on an extended trip, "which had previously been discussed," and that Mr. Morris was in contact with defendant. The Indictment was returned on February 18, 2009. Defendant was arrested on February 25, 2009 in Pensacola Florida.

On March 2, 2009, a Pretrial Services Report was prepared by a probation officer in the

---

[1](Doc. 1 at 3.)

Northern District of Florida, who interviewed both defendant and his wife, Brenda Schmitt Becker.  Defendant advised that he has traveled extensively throughout the world, including Belize, Canada, Chukk, Guam, Mexico, Panama and the Phillippines.  The couple had been living on a boat anchored in Little Sabine Bay, Florida for about two weeks, but defendant advised that they had been living in Pensacola since June 2008.  Mrs. Becker advised that they had been living in the area since September 2008.  Defendant reported no income.  He told the probation officer that he was closing accounts and that he currently lives on a boat that is in a corporate name, which he has no interest in.  Mrs. Becker advised that the boat the couple is living on is leased from a company that she and defendant work for, in exchange for the boat being provided for their use.  She also advised that the couple receives income from mineral rights and that she and defendant perform grant writing that produces sporadic income.  She told the probation officer that Becker Farms, Inc. receives $26,000 annually from a tenant farmer, and noted that it includes 700 to 800 acres of property.

United States Magistrate Judge Miles Davis in the Northern District of Florida ordered detention pending trial, finding by a preponderance of the evidence that there is no condition or combination of conditions of release that will assure defendant's attendance at trial if he were released.  Judge Davis identified defendant's story in general, and his testimony in particular, as not credible.

> I find that taken together, these are hallmarks of someone who has taken steps to hide his assets in order to foil creditors and the forfeiture claims of the government and who intends to disappear to avoid prosecution.  I further find that these actions carry a strong inference of guilt.  I am firmly convinced that defendant has

no intention of voluntarily returning to Kansas for any reason.[2]
After his transfer to the District of Kansas, United States Magistrate Judge Sebelius conducted a second detention hearing.  There is no record of this hearing; however, as the recording equipment apparently failed.  In his Order of Detention, Judge Sebelius also found by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of defendant, largely joining in Judge Davis's findings.

The government has proffered evidence that leading up to the Indictment, defendant was making sales of personal property, including construction equipment, a gun collection, and farm equipment and transferring those assets to an account for Mt. Bethel Enterprises, L.L.C. ("MBE").  This L.L.C. was originally formed in Kansas, with an address in Meriden.  The government acquired a computer disk that had been in Mrs. Becker's possession.  A document recovered from that disk states:

> 2.  We plan to send differing amounts of monies through the years as we sell off assets here in the U.S.  We will begin the amounts in 75,000-100,000 increments and vary from this as we sell various assets and send the proceeds to you for investment.
> 3.  The sending entity will be Mt. Bethel Enterprises LLC.  The owners of Mt. Bethel Enterprises, LLC will be the Phoenix Holdings Group SA, that is owned by Scott Becker Living Trust, Brenda Schmitt living Trust and Ashton Becker.[3]

On March 13, 2008, $422,719.45 was deposited into the Bank of America account for the MBE (Kansas) entity, which was derived from a sale of defendant's share of family land.  The parties proffered evidence that on August 15, 2007, MBE was established in Nevada. This

---

[2](Doc. 5, Attach. 8.)

[3](Ex. 30.)

Nevada L.L.C. holds title to defendant's family farm land in Jefferson county, which was transferred from defendant on October 1, 2007.  Defendant's daughter, Ashton Becker, is a manager and Mrs. Becker is a managing member.  Ashton Becker told the FBI that she signed Bank of America signature cards at defendant's request.  Although she asked defendant and Mrs. Becker for all of the account information that pertained to her holdings, they never provided that information to her.  Specifically, Ashton Becker recently asked Mrs. Becker whether she had any accounts at Bank of America and Mrs. Becker told her there was nothing left there.  At the hearings before this Court, defendant proffered bank records for MBE (Nevada), the Becker Family Foundation, and for Mrs. Becker's grant writing business, Governmental Grants, Leasing & Funding, Inc. ("GGLFI"), also registered in Nevada.  Both defendant and Mrs. Becker have Nevada driver's licenses listing their residences as the same address in Carson City, Nevada for both the Governmental Grants corporation and Mt. Bethel Enterprises, L.L.C.   Defendant's is a commercial driver's license.

Additionally, defendant has proffered statements for Phoenix Holdings Group. Defendant and Brenda Schmitt sent a letter to Ramses Owens in Panama on December 9, 2007, discussing their intent to establish a bank account there. They refer in this letter to a $3000 wire transfer on November 21, 2007, for the purchase of a "Fully Managed corporation" that they had previously spoken of.  On March 3, 2008, Phoenix Holdings Group, S.A.,  a Panamanian corporation, purchased a boat named "Double or Nothing" for $265,000.[4]  Defendant initialed and signed the addendum to the purchase agreement as the corporate representative of Phoenix Holdings Group.  The payment for the boat was wired to Murray Yacht Sales from MBE

---

[4]The boat was renamed "Pearls 'n Boots."

accounts in three installments: $5000 was wired on March 7, 2008, $20,000 was wired on March 21, 2008, and $240,000 was wired on April 2, 2009.[5]  Phoenix Holdings Group maintained a Panamanian bank account with Andbanc.[6]

By May 2008, the defendant and Mrs. Becker were arranging for repairs and upgrades to the boat.  Several checks were written to Troendle Marine from the MBE (Nevada) account, two of which were signed by defendant.  According to the bank records and payment records submitted by both parties, it appears that defendant and Mrs. Becker spent approximately $48,000 on upgrades and repairs to the boat, all paid out of the MBE (Nevada) account.[7] Defendant asserts that the only transaction with the Andbanc account was a deposit for $7169.43, which are proceeds from the sale of some horses and a harnass.  On April 24, 2009, $6843.37 was wired to the MBE (Nevada) account.  Phoenix Holdings Corp. has been "inactivated" and the account with Andbanc has been closed.[8]  On May 1, 2009, Mrs. Becker, on behalf of Phoenix Holdings Corp., signed a Yacht Brokerage Central Listing Agreement for the boat with Murray Yacht Sales, Inc.  Paragraph D of that agreement provides, "Responsibility for the care, custody and control of the YACHT remains entirely with the OWNER.  Although the BROKER may recommend storage, maintenance, and other providers of service, the final decision to employ such services remains with the OWNER."[9]

---

[5](Ex. 6.) The $20,000 payment was wired from the Nevada account (Doc. 405) and the other two payments were wired from the Kansas account (Exs. 6, 403).

[6](Exs. 434–37.)

[7](Ex. 11, 16, 17, 20, 405.)

[8](Exs. 404, 434.)

[9](Ex. 446.)

Defendant also liquidated a valuable firearm collection in 2007 and 2008, the proceeds of which totaled $425,847.50 and were deposited into the MBE (Nevada) Bank of America account. A portion of the proceeds, $124,735, was remitted to G-Trust, the trustee for the Daryl Becker Living Trust; defendant maintains that Ashton Becker is the sole beneficiary of this trust. Defendant's counsel asserts that the remaining portion of the firearm proceeds paid for living expenses.

Defendant testified at the detention hearing in Florida that he transferred the proceeds from the sale of his assets to either his wife's companies, "the foundation," or to pay off various debts.[10]  Specifically, defendant testified that he "donated a massive amount of money to the foundation I created for Junior Olympic female gymnasts.  So I probably put, I don't know, a couple of hundred thousand in that, because I knew I was going to be gone, and I wasn't going to be there every day watching to kind of help do that, so I spent money there."  Now defense counsel represents that defendant was referring, not to money, but to two tracts of land with two gymnasiums, an arena and other site improvements with an estimated replacement cost of $625,227.[11]  This land was transferred from MBE to the Becker Family Foundation, Inc. on June 20, 2008.  It is encumbered by a first mortgage to GGLFI, Mrs. Becker's grant writing business.

The most recent bank account statement for MBE (Nevada) shows a balance of $1655.38 on March 31, 2009.  On April 9, 2009; however, $6843.37 was wired to that account from the Phoenix Holdings Group Andbanc account.  GGLFI had a balance of $26.90 as of February 28, 2009, and the Becker Family Foundation had a balance of $1972.05 as of March 31, 2009.  The

---

[10](Ex. 26 at 39–40.)

[11](Ex. 439.)

aggregate balance of these accounts, based on this evidence, is $10,497.70.

The Beckers married in January 2009.  They intended to learn how to sail Pearls 'n Boots and tour the southern Carribean.  They had hired United States Coast Guard-licensed Captain David Johnson to assist in delivering Pearls 'n Boots to Ft. Lauderdale, Florida.  He intended to teach the couple basic requirements, regulations, and safety precautions for near costal navigation.  They told him that they intended to travel to the U.S. Virgin Islands for "many months" and to continue to Panama and that they planned to return to the Pensacola area.

On March 14, 2008, Mrs. Becker wrote a note to Dennis Hawver, thanking him for his legal assistance that past year and stating: "Knowing you will begin your sailing trip around the world I invite and encourage you to stop in Belize and Panama to visit with me on my new boat."  Likewise, defendant testified at the Florida detention hearing that he intended to sail down to Panama or Belize July through September.  In August 2008, the FBI interviewed Danny Payne, a Becker family friend, who stated that in July 2008 he had attempted to contact defendant by telephone having not heard from him recently.  Defendant returned Payne's call and told him that he was in the process of changing his residency to the Cayman Islands to work in the investment business.  Payne advised that defendant intended to liquidate most all of his real estate holdings except for his house and land in Meriden.  In November 2008, the FBI interviewed Bill Mapes, a longtime associate and business partner of defendant.  Mapes was a caretaker for defendant's home in Meriden.  Mapes advised that Becker has liquidated or transferred his assets and that he plans to spend his retirement years sailing the Caribbean—Mapes has heard Becker mention both Panama and Belize.

David Christy testified at the detention hearing in support of defendant.  He testified that

he has known defendant for over twenty years and they are "like brothers."  Christy testified that, as a retired Kansas Bureau of Investigation agent, he would stake his reputation on the fact that defendant would not flee if released.  Christy lives directly south of defendant's property in Meriden, would be willing to sign a bond and would pledge his property to secure defendant's release.  Christy was unaware of defendant's plans to leave the country in 2008, believing that he and Mrs. Becker only intended to "snowbird" in the winter months.  Christy is unfamiliar with the Phoenix Holding Group, or that Mrs. Becker's corporations were based in Nevada.

At the most recent hearing, defense counsel offered certain assets as surety for defendant's release: (1) approximately 500 acres of land, plus all other assets held by MBE; and (2) David Christy's land, located nearby the Becker family farmland in Jefferson County.  Mr. Christy is also willing to serve as a third-party custodian.  Other conditions of release proposed by defendant are: (1) surrender passports of both Mr. and Mrs. Becker; (2) travel restriction outside Jefferson and Shawnee Counties; (3) periodic production of bank accounts to pretrial services officers; (4) reporting as directed to United States Probation, and permitting unannounced visits by pretrial staff; and (5) electronic monitoring.

### Discussion

The government may seek review of a magistrate judge's detention order.[12]  This Court's review of the magistrate judge's decision to detain defendant pending trial is *de novo*.[13]  A district court must "make its own determination if pretrial detention is proper or set conditions of release" and "ultimately decide the propriety of detention without deference to the magistrate

---

[12]*See* 18 U.S.C. § 3145(b).

[13]*See, e.g.*, *United States v. Cisneros*, 328 F.3d 610, 615 n.1 (10th Cir. 2003); *United States v. Lutz*, 207 F. Supp. 2d 1247, 1251 (D. Kan. 2002).

judge's conclusion."[14] *De novo* review does not require a *de novo* evidentiary hearing.[15]

Under the Bail Reform Act of 1984, the court must order an accused's pretrial release, with or without conditions, unless it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and community."[16] In making this determination, the court must consider the factors found in 18 U.S.C. § 3142(g). Those factors are: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.[17] The Court may examine the following factors to assess risk of flight:

> the nature and circumstances of the offense, the defendant's family ties, employment status and financial resources, the defendant's character and mental condition, the length of defendant's residence in the community, any prior criminal record and any flight or failures to appear in court proceedings. Other factors to examine are the use of aliases, unstable residential ties, efforts to avoid arrest and hidden assets."[18]

The burden of proof is on the government to show risk of flight by a preponderance of the evidence.[19]

---

[14]*United States v. McNeal*, 960 F. Supp. 245, 246 (D. Kan. 1997) (citing *United States v. Carlos*, 777 F. Supp. 858, 859 (D. Kan. 1991); *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987)).

[15]*Lutz*, 207 F. Supp. 2d at 1251.

[16]*See* 18 U.S.C. § 3142(b), (c), (e).

[17]18 U.S.C. § 3142(g).

[18]*United States v. Abdullahu*, 488 F. Supp. 2d 433, 439 (D.N.J. 2007).

[19]*United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003)

The Court's ruling relies on the evidence that was introduced at the initial detention hearing before Judge Davis,[20] including the Pretrial Services Report, and on the extensive evidence submitted by proffer and admitted at both detention hearings conducted by this Court.

The Court finds that the first statutory factor, the nature and circumstances of the offense, weigh in favor of release. This is a white-collar crime case. The offenses are not crimes of violence, nor do they involve narcotics. There is likewise no evidence about the weight of defendant's guilt in this case aside from the Indictment.

The government urges that the fourth factor, the nature and seriousness of the danger to any person or the community that would be posed by the person's release, weighs in favor of detention. There is no evidence in the record that defendant would pose a danger to anyone in the community if released.

The basis for detention thus turns on the history and characteristics of this defendant and the multitude of other factors that the Court may consider when examining risk of flight. In particular, this Court focuses on the defendant's family ties, employment status and financial resources, the defendant's character, unstable residential ties, efforts to avoid arrest and hidden assets. The government contends that the Beckers concealed material information from the probation officer in Florida, that defendant has systematically liquidated his assets and transferred them to charity or to corporations controlled by his wife and daughter or offshore, and that he intended to flee this jurisdiction prior to arrest by sailing to various tax havens in the Caribbean. Additionally, the government points to defendant's lack of ties to Kansas as further evidence that no condition or combination of conditions would reasonably assure defendant's

---

[20]As mentioned earlier in this Order, the Court has no record of the hearing before Judge Sebelius to rely upon, as the recording equipment failed during that hearing.

appearance as required.

As Judge Davis identified in his ruling, the evidence is replete with examples of defendant's weak credibility.  Defendant and Mrs. Becker began "disclosing" their assets and income to the probation officer in Florida.  At that time, Judge Davis noted the inconsistencies between defendant's and Mrs. Becker's renditions of their assets and income, and questioned defendant's credibility after hearing him testify.  These inconsistencies and varied explanations have multiplied with each subsequent detention hearing and brief.

For example, defendant and Mrs. Becker both told the probation officer in Florida that they had no interest in the boat, "Pearls 'n Boots," that they lived on.  Defendant stated that he currently lives on a boat that is in a corporate name, which he has no interest in.  Mrs. Becker advised that the boat the couple is living on is leased from a company that she and defendant work for, in exchange for the boat being provided for their use.  Even after all of the evidence proffered to this Court, it is still unclear who controls Phoenix Holdings Group.  Defendant signed and initialed the purchase agreement in early 2008 for the boat.  Now, defense counsel represents that Mrs. Becker only controls this entity; she signed on behalf of the entity in the recent brokerage agreement.  While defendant's statement to the probation officer may be technically correct, it appears that Mrs. Becker's statement misrepresented ownership of the boat.  There has never been any evidence tending to show that the boat was being leased by the Beckers, much less in exchange for their work.

The Court is also troubled by the large amount of money liquidated and transferred to assets now controlled only by Mrs. Becker, defendant's wife of six months.  All of defendant's land and liquidated personal property has been transferred to Mt. Bethel Enterprises, controlled

by Mrs. Becker.  Defendant maintains that all of these assets can be traced by the bank account records he has provided, but instead, these records often do not support his contentions and in some cases raise more questions.

For example, defendant contends that the boat was purchased with defendant's share of the proceeds from the sale of family land, in the amount of $422,719.45.  He submits a bank account record from the MBE (Kansas) account showing the deposit.  Two of the three boat payments were made from this account, but $20,000 was made from the Nevada account.  Some transfers appear in the Nevada account from the Kansas account for the remainder of this money; all of the repairs and upgrades to the boat appear to have been paid out of the Nevada account. Even assuming that the entirety of the land sale was deposited into the Nevada account, the amount of this land sale exceeds the price of the boat and the cost of the upgrades by over $100,000.  Defendant provides no explanation for how this remaining money was spent.

Defendant contends that Phoenix Holdings Group has been "inactivated," yet the company entered into an exclusive brokerage contract for the sale of the boat.  Defendant represents that the only reason that the company has not been dissolved is due to the cost involved in doing so, but obviously another key reason is that the entity holds an asset in the form of a boat, listed for sale at $299,000.

Likewise, defendant contends that the proceeds of the firearm collection, totaling $425,847.50 was transferred to the trustee for the Daryl Becker Living Trust.  He is correct that $124,735 of the proceeds was remitted to G-Trust, but there is no indication about where the remaining $301,112.50, except that defendant states that it paid for living expenses.

At the hearing before this Court, defendant proffered the bank records for the Becker

13

Family Foundation ("Foundation"), representing that it is a "501(c)(3) corporation" formed in 2007 for the purpose of funding Junior Olympic gymnasts.  While the Foundation account has a current balance of just under $2000, a review of those account statements going back to November 2007 shows that the balance rarely exceeded this sum and was more often well below that amount.  The greatest single deposit during this period of time was made on May 16, 2008, in the amount of $10,000.   These bank account statements do not appear to support Becker's testimony that he transferred "a couple of hundred thousand dollars" into the Foundation.  Accordingly, defendant "clarifies" his prior testimony, now claiming that he was referring to a land sale with improvements that were valued at one time over $600,000.

The unaccounted for proceeds from these various liquidated assets, in conjunction with defendant's weakened credibility, calls into question whether there are unaccounted for funds that defendant currently has access to personally, or through his wife.  There are hundreds of thousands of dollars in liquidated assets unaccounted for given that defendant claims the only cash left in any of these accounts amounts to about $10,000.

Also damaging to defendant's credibility is the matter of his Nevada commercial driver's license.  When defendant was arrested in Florida, he told the probation officer that he had residences in Kansas and Florida, yet she discovered that he had a valid Nevada driver's license issued on October 30, 2007.  In his post-hearing submission, for the first time, defendant explained that he obtained this license so that he could drive the tractor that would pull GGLFI's mobile office trailer.  Because the tractor and trailer were both owned by GGFLI, a Nevada corporation, the State of Nevada required Nevada registration and insurance.  Despite disclaiming ownership of the company, and disclaiming that the mobile office traveled in the

14

State of Nevada, defendant contends that this is the sole reason for his possession of this identification, listing a residence in Nevada at the same address as the corporate addresses for GGFLI and Mt. Bethel Enterprises.

The Court takes into account the fact that defendant believed that the grand jury investigation into this matter had ended up until about May 2008.  It is clear that by that time, defendant was fully aware that the investigation resumed and there is no dispute that by November 2008, he was aware that an indictment was imminent.  AUSA Hathaway advised defendant's former counsel that he expected the indictment to be returned in either January or February 2009.  Despite this knowledge, defendant continued to pursue his retirement dream of sailing by taking lessons and investing more money into repairs and upgrades.  To be sure, the Indictment was filed under seal, but its filing should not have come as a surprise to this defendant.  FBI interviews with Payne and Mapes in late 2008 support the contention that defendant had and/or planned to sale to Belize, Panama, or the Cayman Islands in the near future.  Defendant's sailing instructor corroborates that defendant's plans were to sail the Carribean in the near future.  These plans did not appear to change upon learning that the grand jury investigation had intensified in May 2008, nor upon ascertaining in November 2008 that an indictment was imminent.

There is also some evidence that defendant continues to exert control over the MBE (Nevada) account.  The government has submitted two checks written by defendant and the bank records contain numerous examples of debits made by defendant.  Although this account is controlled by Mrs. Becker, it appears that defendant has the ability to access money from that account.

15

The Court considers evidence that defendant has strong ties to the community in Meriden, Kansas and that he suffers from serious health conditions.  Defendant has lived in Meriden his entire life, until this recent period of time in Florida.  He intends to stay in his childhood home on the family farm land now owned by MBE, upon release.  Defense counsel represented at the hearing that this land has been in the family for decades.  He intends to work on the farm, roofing outbuildings and refitting trailers.  Defendant has numerous friends in the community, including his neighbor, Mr. Christy, who characterizes their relationship as "like brothers."  Mrs. Becker also has children and grandchildren in the area.  Defendant proffers that he suffers from neck problems in jail, due to a broken neck he suffered many years ago, as he has not been provided with a pillow in jail to support his neck.  Defendant also suffers from a bleeding ulcer that can only be controlled through diet; he has lost at least thirty pounds during his detention thus far.

Weighing all of the evidence set forth above, the Court finds that defendant's lack of credibility about whether he has hidden assets and whether he intended to flee before his arrest in Florida counsels in favor of detention.  His explanations for what happened to his highly valued liquidated assets have been a moving target, as have been his explanations for why he was poised to sail away on a boat to Panama just prior to his arrest, despite having knowledge that an indictment was imminent.  The Court is concerned that this lack of credibility relates to defendant's assets, financial affairs and access to funds, either directly or indirectly that would give him the means to sail away or otherwise flee.  The Court again emphasizes defendant's ever-shifting and incredulous explanations for his Nevada driver's license, identification that was obtained by falsely representing to Nevada authorities that he maintained a residence in

Nevada.  He explains that he obtained a commercial driver's license in order to haul around his

wife's mobile home-based grant writing business, despite her renting office space in Nevada

from which she could operate the business.  A boat, a mobile home, and Nevada driver's licenses

all point to defendant having the means and mechanisms to flee and evade these charges.

　　　The question before this Court, however, is whether the government has shown by a

preponderance of the evidence that no condition or combination of conditions will reasonably

assure the appearance of defendant as required, despite the balance of all of the above-cited

evidence favoring detention.  Defendant has suggested a number of conditions that he contends

will assure the Court of his appearance such as home detention, travel restrictions, third-party

custodians, etc.

　　　But the problem with these suggestions is that they all depend upon an "honor system"

with the Court, which in turn, depends upon defendant's credibility.  As the Court has already

noted, defendant's credibility is the determining factor weighing in favor of detention.

Furthermore, the Court is not convinced that defendant's suggested surety of his family farmland

would reasonably assure his appearance.  This land, which he represented has been in his family

for decades, no longer belongs to him.  Defendant transferred this land to MBE, a company

controlled by his wife of less than one year, and was conveyed before the couple was married.  It

is also encumbered by a first mortgage granted to Mrs. Becker's other company, GGFLI.

Although defendant's daughter is a manager of this company, she was unaware of the existence

of MBE when interviewed by the FBI and complained that she had been unable to gather

information about any of her Bank of America accounts from defendant or Mrs. Becker, despite

requesting this information.  Therefore, it appears to the Court that defendant is not as personally

invested in this land as he purports to be.

And while the Court is impressed with Mr. Christy's dedication to defendant and solemn promise that defendant will not flee, his testimony makes clear that Mr. Christy is not in a position to make such an assurance.  Mr. Christy was not even aware that defendant had left for Florida, or of his intention to sail the Caribbean and not return to Kansas.  This testimony calls into question whether Mr. Christy is in a position to be able to assure defendant's appearance. While the Court hopes that defendant would not subject his friend to a loss of his valuable land, given the charges in this case and the fact that defendant has already divested himself of numerous assets that he claims to be personally attached to, the Court is not convinced that this surety would sufficiently assure his appearance in this matter.

Finally, the Court is troubled by the fact that the boat "Pearls 'n Boots" is still in the custody and control of Mrs. Becker and Phoenix Holdings Group.  While the Court is cognizant that the brokerage company has moved this boat to New Orleans for sale, it is apparent from the brokerage contract that the owner of the boat (i.e. Phoenix Holdings Group) maintains possession of the boat, contrary to defendant's assertion in his post-hearing brief.  Moreover, there has been no attempt to offer this asset as security for defendant's appearance, despite the fact that it is obviously owned by a company controlled by Mrs. Becker and is listed for sale at $299,000.  For all of these reasons, the Court is unable to find that there is a condition or combination of conditions that will reasonably assure the appearance of defendant as required.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Scott D. Becker's Motion for Rehearing and Appeal of Detention Order (Doc. 40) is **denied**.

**IT IS SO ORDERED.**

Dated:  <u>June 17, 2009</u>

<u> S/ Julie A. Robinson                 </u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE